# The Chicago and Alton Railroad Company
## *v.*
## Dennis Wise.

*Opinion filed December 16, 1903—Rehearing denied February 3, 1904.*

1. RAILROADS—*ordinance requiring gates at crossings construed.* Under an ordinance requiring gatemen and flagmen at crossings "to pay diligent attention and use every effort to notify and inform" all teams, vehicles and persons of the approach of any locomotive or cars, "and, in the case of gates, to lower them so as to obstruct the approach along said streets to said railroad track," the gates are intended to serve as a warning as well as a physical obstruction.

2. SAME—*crossing ordinance is designed to protect persons whether they come upon street inside or outside of gates.* An ordinance requiring a gateman at a place where a street crosses a large number of tracks of several companies, to "notify and inform all teams, vehicles and all and every person or persons" of the approach to the crossing of any engine or cars, is intended to protect all persons, whether they come upon the street within or without the gates.

3. SAME—*it is the duty of a gateman to drop the gates whether persons are approaching the tracks or not.* Under an ordinance requiring a gateman to lower the gates "so as to obstruct the approach" to the track whenever an engine or car is approaching the crossing, it is his duty to drop the gates on each side of the track whenever an engine or car approaches the crossing in a manner indicating that it will cross over the street, whether he sees persons or teams approaching the tracks or not.

4. FELLOW-SERVANTS—*gateman and foreman of switch crew are not necessarily fellow-servants.* A gateman at a railroad crossing and a foreman of a switching crew working in the yards of the same city are not necessarily, and as a matter of law, fellow-servants.

5. SAME—*effect where negligence of master and fellow-servant is combined.* If the negligence of the master is combined with that of a fellow-servant in producing injury, and the negligence of neither is, alone, the efficient cause of injury, both the master and fellow-servant are liable, and the injured servant may sue either or both.

6. PLEADING—*when averment in a count for negligence is surplusage.* In a count alleging that the railroad crossing where the accident occurred was unusually dangerous and that it was the duty of defendant to notify persons about to cross the track of the approach of engines or cars, an averment that the crossing was frequented by five thousand persons daily is surplusage, and proof thereof is not essential to sustain the count.

*Chicago and Alton Railroad Co.* v. *Wise*, 106 Ill. App. 174, affirmed.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Will county; the Hon. JOHN SMALL, Judge, presiding.

Jackson street, in the city of Joliet, runs east and west, and is crossed at about right angles by the tracks of four railroad companies. On the east is the track of the Elgin, Joliet and Eastern, then in order on the west come three tracks of the Lake Shore, five tracks of the Chicago and Alton, and then five tracks of the Chicago, Santa Fe and California. At the time of the occurrence upon which this action is based there was an existing ordinance of the city providing that every railroad corporation, or other corporation operating or using by steam power any railroad track within the limits of said city, should erect, maintain and operate, at its own expense, gates at every public street or avenue crossed by such track and specified by ordinance, and station flagmen at street crossings not provided with gates; that it should be the duty of the persons who operated said gates, and the flagmen stationed at street crossings, to pay diligent attention and use every effort to notify and inform all teams, vehicles, and all and every person or persons, by means of flags by day and colored lights by night, and, if directed by ordinance, by the ringing of a bell of a prescribed size and weight, of the approach to said crossings of any locomotive engine, car or train of cars, "and in case of gates, to lower them, so as to obstruct the approach along said streets to said railroad track or tracks." The ordinance further provided that appellant should erect and maintain at its own expense, at all times, both day and night, gates, with tenders to operate the same, at the point where its tracks crossed Jefferson, Cass and Jackson streets, provided "that, inasmuch as the tracks of the Chicago and Alton, the Chicago, Santa Fe and California and the Elgin, Joliet and

Eastern railways cross Jackson street in close proximity to each other, said companies may unite in the erection and maintenance of gates at said crossing, provided said gates are operated from a tower." To conform to the provisions of said ordinance, gates were erected by the three companies mentioned at the Jackson street crossing, the east gate being located on or near the east line of the right of way of the Elgin, Joliet and Eastern Railway Company and the west gate about on the west line of the right of way of the Chicago, Santa Fe and California Railway Company, being about three feet west of the most westerly rail of the tracks of said company. These gates were operated from a tower, which stood on the north side of the street between appellant's west two tracks. The lower side of the windows of the tower were nineteen and one-half feet above the ground, thus giving the operator an unobstructed view of the street in both directions.

Appellee had been employed by appellant for about two years. He was foreman of a switch gang, consisting of an engineer, fireman, two switchmen and himself. On June 27, 1900, at about six o'clock A. M., appellee, with his crew, started with a small switch engine on one of appellant's tracks north towards Jackson street. He and his two switchmen were riding on the foot-board in front of the engine, appellee being on the west end of it. Their view, as they approached the Jackson street crossing, was obstructed on the west by cars standing upon the tracks there located. The whistle was not sounded nor the bell rung as the engine advanced, and just before the crossing was reached one of the switchmen, Glenn, saw a horse, drawing an open wagon, coming easterly along the street from behind the cars. Glenn called out to the others to jump, and jumped off the engine himself. Appellee attempted to jump off on the west side of the engine, which was then running at the rate of six to eight miles an hour, but was caught between the horse and

wagon and the engine, and severely injured. The injuries suffered by him were to his right leg, the thigh being fractured and the muscular tissues bruised and lacerated. Some of the muscles had to be removed, and appellee's leg was thus shortened about two and one-half inches. The horse with which the engine came in collision at the time appellee was injured was driven by one E. L. Graves, who was engaged in delivering meat shipped into Joliet by rail. He had loaded his wagon at a car on the tracks of the Chicago, Santa Fe and California, south of Jackson street, and had then started north on a roadway between two of the said tracks to Jackson street. When he reached the street crossing he was on the right of way of the latter road and within the west gate. This gate was up, and Graves turned east on the street. He had gone but a short distance when the collision occurred.

The evidence shows that the man at the tower, who had charge of the gates, was not attending to his duties. He claims that the east gate was down; that there were some teams on the east side of that gate; that switching was being done on the tracks near that gate, and that he was watching the gate for the purpose of letting the teams across when an opportunity should occur; that by reason of his being so occupied he failed to see the approach of the engine until after the accident. He is contradicted by three witnesses, who swear that the east gate was up and that there were no teams east of it. There is also proof in the record that he was not in sight in his tower before the accident. He failed to give the warning of the approach of the engine, which the ordinance required he should do.

Appellee brought suit against appellant and others, but afterwards dismissed his suit as to all but appellant. Upon the trial the jury returned a verdict in favor of appellee for $8500, and a motion for a new trial having been overruled, judgment was entered by the court for that

amount.   This judgment has been affirmed by the Appellate Court for the Second District, and the defendant below appeals to this court.

C. W. Brown, for appellant.

John W. D'Arcy, (C. B. Garnsey, of counsel,) for appellee.

Mr. Justice Scott delivered the opinion of the court:

The statement of facts contained in the opinion of the Appellate Court in this cause is, we think, substantially correct.   We have made such alterations therein as we deemed proper, and as so altered the same is above set forth and adopted as our statement of facts.

The question is properly presented here, whether, as a matter of law, the evidence for the plaintiff below, with the reasonable inferences to be drawn therefrom, is sufficient to warrant a verdict for the plaintiff.   Appellant attempts to excuse the failure of the tower-man to lower the west gate on Jackson street, by reasoning that under the terms of the ordinance the company was required to obstruct the approach to the tracks by the use of the gates and that it was not required to lower them as a warning, and that even if it could be held that one about to go upon the tracks had the right to expect a warning by the gates being lowered, such right existed only for the benefit of persons approaching the railroad tracks from without the gates, and that Graves, who came upon Jackson street from the south, driving between two tracks of the Santa Fe. road, was not within that class of persons that was entitled to notice of the approach of trains by the lowering of the gates.   We think this entirely too strict a construction to be placed upon the ordinance. It provides: "And it shall be the duty of the persons who operate said gates, and the flagmen so stationed, * * * to pay diligent attention, and use every effort to notify and inform all teams, vehicles, and all and every

person or persons, by means of flags by day and colored lights by night, * * * of the approach to said crossings of any locomotive engines, car or train of cars, and in case of gates, to lower them, so as to obstruct the approach along said streets to said railroad track or tracks." We think it a fair construction of this ordinance that the gates were intended as a physical obstruction and as a warning as well. The succeeding section of the ordinance provides for having one gate west of the Santa Fe tracks and one east of the Elgin, Joliet and Eastern, both to be managed from a tower, instead of having one gate on each side of the tracks of each of the four companies whose tracks cross Jackson street between these two gates. We think it perfectly manifest that the purpose of this ordinance is to afford protection to all persons who cross any of these tracks on Jackson street, no matter where they come upon Jackson street,—whether within or without the gates. By appellant's theory, a man who comes upon this street, as did Graves, from the south, between the tracks of the Santa Fe, and who turns east on the crossing and passes over the tracks of appellant and over the tracks of the Lake Shore, and then turns south and goes off the street upon the right of way of the Elgin, Joliet and Eastern, is left wholly without protection, so far as the ordinance is concerned. We cannot agree with this conclusion. The purpose of the ordinance was to afford protection to a man who only desired to cross the tracks of appellant on Jackson street, as well as to a man who desired to cross the tracks of all four companies on that street.

It is further contended that Rubens, the tower-man, was guilty of no negligence, because he swears that at the time the engine in question approached Jackson street no one was approaching the railroad tracks from the west on Jackson street, and it is concluded that as he could see no one approaching, appellant was under no obligation to lower the gates. Under the ordinances

of the city of Joliet above quoted, it is the duty of appellant to have these gates lowered whenever one of its engines or cars approaches Jackson street under such circumstances that make it appear reasonable to the tower-man that it is coming upon or going across that street. It is not for him to look or speculate about whether persons are approaching the track or not. His duty is to determine whether engines or cars are approaching the street and whether they will come upon the street, and if so, to drop the gates. By his own showing he was guilty of negligence on this occasion. He says he had the east gate down to keep persons east of that gate off the tracks on account of switching on the tracks near that gate. If this were true, it was also his duty to drop the west gate for the purpose of preventing persons from the west approaching the eastern tracks where the switching was being done. So far as appears from his testimony he did not see Graves' horse and wagon, or the engine upon which appellee was riding, until after the accident. The evidence of three witnesses, offered for appellee, showed that the east gate was not down and that there were no teams waiting at that gate to cross at the time of or immediately preceding the accident, and there was evidence from which the jury were warranted in drawing the inference that at the time of the accident Rubens was not in the tower at all, or if he was there, he was lying down.

Graves testified that as he came upon Jackson street from the south, he looked to see if the west gate was up, and finding that it was, he proceeded east on Jackson street, and it is said that if it be true that appellant was negligent in failing to have the west gate lowered at that time, still the proximate cause of the injury was the fact that as the engine approached the crossing the bell was not rung and the whistle was not sounded, and that this was the negligence of appellee, who was the foreman of the switching crew. It does not appear to

have been the duty of the foreman to ring the bell or sound the whistle. That, ordinarily, is the duty of the engineer or fireman, and in the absence of any evidence on the subject we cannot presume that this obligation devolved upon the foreman in this instance. The engineer and fireman, however, were the fellow-servants of Wise, and he could not recover against appellant for an injury received on account of their negligence alone, and counsel for appellant take the position that Rubens and Wise were also fellow-servants. To constitute two servants fellow-servants it is necessary that they should be directly co-operating with each other in a particular business in the same line of employment, or that their duties be such as to bring them into habitual association, so that they may exercise a mutual influence upon each other promotive of proper caution. (*Chicago and Northwestern Railroad Co.* v. *Moranda*, 93 Ill. 302; *Chicago and Eastern Illinois Railroad Co.* v. *Kneirim*, 152 id. 458.) These men were not co-operating with each other. It was the business of appellee to assist in and superintend the switching of the cars of appellant in its yards at Joliet, occasionally crossing Jackson street, while it was the business of Rubens to handle the gates at this crossing, lowering them as engines or cars approached and raising them after they had passed. The duties of the two men were independent each of the other. Nor did those duties bring them into habitual association; they did not bring them into association at all. They simply made it possible that they might see each other on those occasions when appellee crossed Jackson street or came near to this street. We cannot hold, as a matter of law, that the two were fellow-servants. It is apparent from the testimony of Graves that he would not have turned east and attempted to cross the tracks of appellant if the west gate had been down. It follows, then, that the injury resulted from the negligence of Rubens, the towerman, which is the negligence of appellant, and the negli-

gence of the engineer and fireman operating the engine, who were the fellow-servants of the injured man.   But for the negligence of Rubens the negligence of the fellow-servants would not have been sufficient to cause the accident; but for the negligence of the fellow-servants the negligence of Rubens would not have been sufficient to occasion the accident.   The negligence of appellant and the negligence of the fellow-servants coincided to cause the accident, and together were the proximate cause thereof.

Where the negligence of the master is combined with the negligence of a fellow-servant in producing the injury, and the negligence of neither is, alone, the efficient cause, both the master and the fellow-servant are liable, and the injured servant may maintain his action against either or both together.   12 Am. & Eng. Ency. of Law, (2d ed.) p. 905; *Pullman Palace Car Co.* v. *Laack*, 143 Ill. 242; *Chicago and Northwestern Railway Co.* v. *Gillison*, 173 id. 264.

The court properly refused to instruct the jury to find for the defendant.

What we have said in reference to the construction to be placed upon the ordinances of the city of Joliet disposes of the errors assigned upon the action of the court in modifying the fourth and refusing the fifteenth instruction asked by appellant.

The sixteenth instruction requested by appellant directed the jury to find a verdict of not guilty as to the second count of the declaration.   This count avers that the crossing was of an unusually dangerous character, and, without relying upon the provisions of the ordinances of the city, charges that it was the duty of appellant to give notice to persons about to cross its tracks on Jackson street of the approach of the engines or cars of appellant, and that it failed in this duty.   It is drawn on the theory that in view of the long continued practice of appellant in reference to the use of the gates at this crossing, independently of the ordinances, it could not

at once cease their use without incurring liability to persons who might be injured as a result of such cessation and who had been familiar with the practice theretofore followed by appellant, where no notice of any kind had been given by the appellant that any change would be made. There is evidence in the record which tends to prove the averments of this count so far as·they have been referred to above.

The count also charged that the crossing was frequented by five thousand persons daily. Of this there is no proof, and it is said that this is a material averment, and there being no proof to sustain it, the instruction as to this count should have been given. The count was not strengthened by this averment, which might therefore be rejected as surplusage, and that being true, the count could be sustained without any proof in reference thereto.

By this count, plaintiff sought to recover for money expended for medicines and physicians' services. It appears from his testimony that he was in a hospital for thirty weeks, and that Dr. Cushing and Dr. Frederick treated him. Martin W. Cushing, a physician, testified that he was in attendance upon appellee immediately after the accident and before he had been removed from the place where he was hurt; that he went to the hospital shortly after the patient was taken there, and visited him there every day for from twenty to twenty-five weeks, making one to three visits a day, treating him for the injury received in this accident. He was then asked, "What were your services reasonably worth for the attention you have given the plaintiff in connection with the wound you have referred to?" An objection was interposed, which was overruled. Thereupon counsel, instead of having the reporter read the question, asked this one: "What were your services reasonably worth, as a physician, for the attention and the treatment and services you performed in connection with the

plaintiff from the time of the injury up to the present, as physician?" After an objection had been overruled and an exception preserved the witness fixed the amount at $500. It is objected that this question which was answered permits the physician to fix the value of his services rendered the appellee whether those services were rendered in treating him for the injuries complained of or for something else, and that this bill of $500 may include services aside from treatment made necessary by this injury. The witness had just been over a long recital of his treatment of appellee and had heard an objection overruled to a question just preceding this one which properly defined the services the value of which was to be fixed, and while this question is not entirely accurate, we do not think the witness could have had reference to any charge except his charges for treating appellee on account of the injury received at the Jackson street crossing. The objection interposed was a general one. Had the specific objection now presented been made on the trial, no doubt it would have been obviated.

This medical gentleman, when asked if he had an account against plaintiff, stated that he had one against somebody, but did not know whether it was against the plaintiff or not, and it is urged that because he did not say that the account was against appellee the evidence was improper, or, as counsel puts it, "If the claimant himself did not know, how are the court or jury to ascertain?" If this were a suit by the physician we would be inclined to give weight to this proposition, but as the claimant or plaintiff here is appellee, and not the physician, and as it plainly appears that appellee is liable for the payment of this bill, this objection is without merit.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*