**Richard Yeates, Appellee, v. Illinois Central Railroad
Company, Appellant.**

**Gen. No. 14,184.**

1. CUSTOMS—*how proof of may be made.* The usual manner
of conducting a business at the place of an accident established by
rule or rules duly promulgated by persons in authority or growing
out of the practice of employes long-continued, is competent to be
shown as shedding light on the acts and conduct of the parties and
has a bearing on the question of negligence.

2. NEGLIGENCE—*when conduct of switch-tender question for jury.*
*Held,* that in view of the specific circumstances of the case shown
by the evidence, including a severe snow storm which was prevail-
ing at the time of the accident in question, and the consequent

condition of the atmosphere, making it impossible to see but a very short distance, it was a question for the jury to determine whether the defendant's switch-tender was guilty of negligence or not in throwing switches and signalling the switch crew, of which plaintiff was a member, to proceed in a particular direction upon a particular track.

3. NEGLIGENCE—*when switch-tender guilty of.* *Held*, under the evidence in this case, that the jury were justified in finding that it was negligence on the part of a switch-tender not to halt a train but to send it forward ahead of the usual time.

4. NEGLIGENCE—*when proximate cause of injury.* Negligence is the proximate cause of an injury if it appears that but for such negligence the injury would not have happened even though not the nearest cause in the order of time.

5. MASTER AND SERVANT—*who not fellow-servants.* A switchman under the orders of a conductor is not a fellow-servant of such conductor.

6. TORTS—*what does not discharge joint tort-feasor.* A covenant not to sue one of two joint tort-feasors is not a bar to a suit against the other.

Action in case for personal injuries. Appeal from the Circuit Court of Cook county; the Hon. RICHARD W. CLIFFORD, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1907. Affirmed. Opinion filed December 4, 1908.

**Statement by the Court.** This is an appeal from a judgment of the Circuit Court for $22,500 in favor of Richard Yeates, appellee, and against the Illinois Central Railroad Company, appellant, for damages for personal injuries alleged to have been caused by the negligence of appellant on December 12, 1903.

The plaintiff, appellee, filed an original declaration consisting of three counts, and later an amended declaration consisting of seven counts. On the trial, the jury were instructed to disregard the third, fifth, sixth and seventh counts of the amended declaration and the case was submitted on the first, second and fourth counts thereof, to which the general issue was pleaded. The negligence alleged in these counts is in substance that on the date above mentioned, Moore, a switch-tender of appellant, threw a switch and signalled and permitted the train in charge of a switching crew of

the Michigan Central Railroad Company, of which crew appellee was a member, to run northward along a track leading from tracks used in common by the appellant and the Michigan Central Railroad Company into the yards of the latter company on the lake front in the city of Chicago, at a time when he, Moore, knew that a road engine was liable and likely to be backing southward upon the same track, and that he negligently failed and omitted to notify those in charge of the in-going train that the road engine was liable and likely to be running south upon said track. No question is made on the pleadings, and it is not deemed necessary to set out specifically the averments of these counts of the declaration.

The evidence in the record shows without any substantial controversy the following facts: The Michigan Central Railroad tracks running into Chicago end at Kensington, and from that point its trains run into the city over the Illinois Central tracks to Harrison street, where they are switched onto tracks known as Nos. 5 and 6. No. 5 track is commonly used for trains going north into the Michigan Central yards, which extend from South Water street south to about Adams street. Between that point and Harrison street the two tracks, Nos. 5 and 6, are held by that company under a lease in perpetuity. Track No. 6 is commonly used for trains going south out of the yards.

At Harrison street is a diamond switch, which at the date of the accident was operated by a switch-tender in the employ of appellant, who threw the switches for all trains passing that point. The switch-tender was paid by appellant, but appellant was reimbursed by the Michigan Central company to the extent of one third of his wages.

While tracks 5 and 6 were commonly used as stated above, whenever track No. 5 was occupied or blocked, track 6 was also used for trains going north; and in addition to being used as a lead track, it was also used as a switching track nearly as far south as Harrison street.

When trains were delivered on track 5, it was the practice after the train had pulled in, to detach the road engine from the train, take the engine across to track 6 and proceed south with it on that track as soon as possible, out through the Harrison street switch to the engine house. Then a switch engine would come south over track 6 and back in behind the train on track 5 and push it up into the yards. Sometimes the switch engine would go south before the road engine. When delivery was made on track 5, the train was pushed on north into the yards; and when a train went north on track 6 it was the practice to go cautiously and under full control as engines might be expected at any time going south on that track.

The morning of December 12, 1903, was foggy and stormy, the worst snow storm of the year, according to the weather bureau, being in progress. About 8:30 o'clock that morning a Michigan Central freight train from Michigan City, Indiana, arrived over the track of appellant and stopped a little south of the Harrison street switch, waiting for a signal from Moore, the switch-tender. In a few minutes the switch-tender signalled it to come ahead, and it then ran north over the switch into and along track 5, until the rear end of the train was far enough in to clear track 6. The engine was then uncoupled from the train, and passed north and over to and upon track 6. It then started south on track 6.

Just after the freight train passed in on track 5 the transfer or switch train, upon which appellee was the forward switchman, came north and stopped a little south of the Harrison street switch and waited for a signal from the switch-tender, Moore. No one of the crew in charge of the transfer or switch train knew that a road train had just pulled in on track 5. After waiting a few minutes, the switch-tender lined up the switches and signalled the switch train to proceed. Upon receiving the signal the switch train with its engine at the north end of the train proceeded north over

the switch.  All of the members of the crew testified that they did not know they were to be let in on track 6, until they reached the switch which turned them in upon that track.  Some of the crew then observed the freight train standing on track 5, but none of them knew that the road engine, which had pulled the freight train in, had not come out on track 6.

At this point there is a conflict in the evidence.  The switch-tender, Moore, testified that as the engine of the switch train was passing him he shouted to them, ''Go up No. 6.  I am letting you up the wrong main; go up easy.''  This is denied by all the members of the switch crew.

The switch train proceeded north very slowly and under full control, as the members of the crew testified that they were expecting to meet an engine coming south on track 6 at any moment.  The bell on the switch engine was ringing.  When the switch engine reached the Jackson street viaduct it collided with the road engine coming south, and appellee was crushed between the engine and tender, and so injured that it was necessary to amputate both his legs above the knees.  The road engine was running south at a rate of speed from six to twelve miles an hour at the time of the accident; and at the Jackson street viaduct, steam from an Illinois Central engine standing to the east was blowing across the track.  This, in connection with the snow storm, made it impossible for the crews of the engines to see more than a car length ahead.  There is some controversy in the evidence as to whether or not there was a practice or custom in 1902 and 1903 regarding the letting in of trains on track 6 and holding trains at the Harrison street switch when track 5 was blocked, or until the road engine of the preceding train had come out.

The Michigan Central Company was made a party defendant to this action originally, but later appellee settled with that company and gave to it a covenant not to sue, and this action was dismissed as to it.

At the completion of the evidence of appellee, and again upon the completion of all the evidence, appellant moved the court for a peremptory instruction and tendered a written instruction with such motion. Both motions were denied and the instructions were refused.

CALHOUN, LYFORD & SHEEAN, for appellant; JOHN G. DRENNAN, of counsel.

JAMES C. McSHANE, for appellee.

MR. PRESIDING JUSTICE SMITH delivered the opinion of the court.

The theory of the first count of the amended declaration is that the switch-tender wrongfully and negligently threw the switches and signalled the crew in charge of the switch engine and train to run north on track 6 while the road engine was backing south on that track and before it had passed out of it. This count does not base the right to a recovery upon any failure on the part of the switch-tender to warn the switch crew that the road engine had not passed out. The second and fourth counts of the amended declaration base the right to a recovery on the same negligence alleged in the first count, and in addition thereto these counts aver that the switch-tender negligently failed to notify the switch crew that the road engine had not passed out and was then backing south on track 6, or was likely to be backing south on that track.

Appellant contends that the trial court erred in refusing to sustain its motion for a peremptory instruction made at the close of appellee's evidence and renewed at the close of all the evidence.

In support of this contention appellant insists that the evidence does not tend to show negligence on the part of the switch-tender, or, if there was negligence on his part, that such negligence was the proximate cause of the accident by which appellee was injured.

The testimony of the members of the switch crew,

Fogarty the foreman, Mick the engineer, Collins a switchman, and appellee, shows that they all knew and appreciated the danger they were in when they went upon track 6; that when they saw there were cars standing on track 5 they knew that an engine might at any time come south on track 6; that "just as soon as the yardmaster could get to it there would be an engine come south on No. 6 to push these cars off of No. 5"; and for that reason they proceeded very slowly and cautiously, ringing their bell, and before going under the Jackson street viaduct, where the steam and smoke were the densest, the engineer brought his engine under perfect control and had practically come to a stop.

This evidence offered by appellee to show that the switch engine crew was not guilty of negligence in the operation of its train is cited by appellant as showing that appellee and his fellow-servants knew, when they were running on track 6, that there was a probability they would meet an engine running south on the same track, and knowing this fact, they were not relying upon any supposed assurance of the switch-tender that no engine would be on that track. On the contrary, they proceeded north on that track, expecting to meet another engine and to be able to stop in time to avoid a collision, their action indicating that they fully understood the situation and were conscious of the danger they were running, as fully as if they had heard Moore say to them what he testifies he said: "Go up No. 6. I am letting you up the wrong main, go up there easy."

This evidence, however, must be considered in connection with the fact shown by the evidence that the crew of the switch engine did not know that the road engine had not backed out and in all probability was running south on track 6 when the switch-tender signalled them to pass over the switch and ran them on to that track. The jury were justified by the evidence, we think, in finding that Moore knew, or should have

known, that the road engine was backing south on track 6. He knew that the road train had passed over his switch and upon track 5, not more than five minutes before he allowed the switch train to pass north over his switch, and that the road engine was due to come out over track 6 at that time, which was about the usual time taken. He knew that the general custom was for road engines and engines of other roads making deliveries to come out as soon as possible. There is little or no contradiction in the evidence as to this uniform custom.

There is much contradictory evidence in the record, also, as to another custom and practice of long duration at this switch, for the switch-tender to hold out in-bound engines or trains until the road engines, which had delivered a train on track 5, had come out on track 6. This custom and practice was testified to by twelve witnesses, including the switch-tender Moore. The latter testified that he had attended to the Harrison street switches for three months at the time of the accident in question; and if track 5 was obstructed with a train and another train was following it in, he held them out until the road engine came out; and that until the morning in question he "never let a train in until after the road engine had come out".

In contradiction of this evidence, appellant introduced evidence of a number of witnesses to the effect that orders were never issued to this switch-tender, or anyone else, by any officer or employe of appellant having authority over him to hold trains out of these tracks, except in special instances, and that whenever given the order was special and not general, and was to apply only in that particular case. And it is contended that a switch-tender had no authority to establish such custom on his own initiative. But, we think, that if such a custom existed, as a matter of practice, though not by superior authority, the crew of the switch train would have a right to rely upon it, and to believe and assume that when they were admitted through the

switches at Harrison street and turned upon track 6, the road engine of the train standing on track 5 had passed out.

Considering the evidence of the custom or practice in view of the particular situation, and the reasonableness or unreasonableness of such a custom or practice under the situation and circumstances shown by the evidence, we think the jury were justified in finding that such custom and practice existed.

It is appellant's contention, however, that there is no competent evidence of the fact of this custom or practice because it is not shown that the rule was regularly promulgated by appellant or by anyone in authority authorized to make such rule or custom; and authorities are cited from other jurisdictions to support this position. We think, however, it is the settled law of this state that the usual manner of conducting the appellant's business at the place of the accident, whether it was established by a rule or rules duly promulgated by persons in authority, or it grew out of the practice of employes long continued, is competent to be shown as shedding light on the acts and conduct of the parties, and has a bearing on the question of negligence. St. L., N. S. Y. v. Godfrey, 198 Ill. 288; C., R. I. & P. Ry. Co. v. Rathneau, 225 id. 278, 284; C. & A. R. Co. v. Harrington, 192 id. 9; N. C. St. R. R. v. Kaspers, 186 id. 246; C. C. Ry. Co. v. Lowitz, 218 id. 24; and Franey v. Union Stock Yards Co., 235 id. 522. As said in Luebke v. C., M. & St. P. Ry. Co., 63 Wis. 92: "It was a sort of common law of the company, obligatory upon its employes, and as thoroughly understood by them as though it had been embodied in the printed regulations and read by the officers of the company to them. It thus became a rule or custom of the company, as well as an understanding between its employes".

It appears clearly from the testimony of Sheehan, the Michigan Central yardmaster, and other evidence in the case, that the effort and practice was to keep

track 5 clear and get the road engines out of the yard and off tracks 5 and 6 as quickly as possible; and that as soon as he knew or received word that a train was coming he generally had a switch engine waiting to start out on track 6 and push the train into the yard; and that sometimes the switch engine would follow the road engine out and sometimes the road engine would follow the switch engine, and in the great majority of cases both engines went right out at the same time. If, therefore, in-going trains or engines were held out according to the custom stated above, until the road engine had gone south over the switch at Harrison street there was usually and ordinarily no danger, for an engine or train going north on track 6 when track 5 was blocked, of meeting a south-bound road or transfer engine having the right of way and proceeding rapidly, and correspondingly there was little or no danger for the road engine or switch engine going south of meeting an engine on track 6, unless they were detained in the yard an unusual time; and in that event they knew, as a matter of course, that they did not have the exclusive right of way which the custom otherwise gave them, and that they might expect to meet an engine or train going north on track 6 if track 5 was blocked, and they would govern themselves accordingly.

In view of these considerations and the evidence of the special circumstances of the case, including the severe snow storm which was prevailing at the time, and the consequent condition of the atmosphere, making it impossible to see but a very short distance, it was a question for the jury to determine whether appellant's switch-tender was guilty of negligence or not in throwing the switches and signalling the switch crew, of which appellee was a member, to proceed north on track 6. The trial court did not err, therefore, in denying appellant's motions for a peremptory instruction to the jury.

In our opinion the evidence does not show that either appellee or the crew of which he was a member was

guilty of negligence.  But if the conductor, or engineer or other member of the crew was guilty of negligence in not flagging the road engine, such negligence cannot be imputed to appellee.  He was a switchman, under the orders of the conductor, and did nothing to influence or contribute to their negligence, if any.  He was at his post of duty, as the evidence shows, and was crushed without fault or negligence on his part. C. U. T. Co. v. Leach, 215 Ill. 184; Nonn v. C. C. Ry. Co., 232 id. 378; C. & A. R. R. Co. v. Harrington, *supra*; C. & A. R. R. Co. v. Vipond, 212 id. 199.

The liability of appellant for the injuries sustained by appellee depends, therefore, upon the question whether appellant owed to appellee a duty, under the facts and circumstances shown by the evidence, and whether or not it was guilty of negligence with reference thereto, which caused the injury complained of. In our opinion it was the duty of appellant's switch-tender to hold the switch train and not send it north on track 6 until the usual time had elapsed for the road engine to deliver its train and back out on track 6 in the usual way, and that this duty was especially imperative under the extraordinary conditions existing on the morning in question.  The switch-tender was guilty of negligence in failing to perform that duty.

The further question then remains on this branch of the case, was this negligence the proximate cause of appellee's injury.

We first notice appellant's contention on this question, that even admitting that the switch-tender was negligent at the time he let the switch train in and upon track 6, and that the effect of that negligence continued until after appellee knew they might meet an engine on that track, the switch-tender's act was not the proximate cause of the accident, because the evidence shows that the accident was caused by the negligence of the engineer on the road engine in going at a speed of 6 to 12 miles an hour without ringing his bell, when by reason of the blinding storm and

steam he could see but a short distance ahead. In other words, the contention is that the negligence of the engineer of the road engine was an independent intervening cause which broke the causal connection between the switch-tender's negligent act and the collision.

As we have in effect said *supra,* even if the engineer of the road engine was guilty of negligence, and even though the conductor or engineer of the switch train was guilty of negligence, that fact would not relieve appellant from liability if the switch-tender's negligence was also a proximate or concurrent cause of the accident.

The negligence of the road engine could not have resulted in a collision had it not been for appellant's negligence in running the switch train north upon track 6. The switch tender was as much responsible, under the evidence, for the presence of the switch train at the point of collision as though he had run the train to that point with his own hands. If the act complained of so operates as to put the person in the way of the new force or independent act, it is a proximate cause. Meyer v. Butterbrodt, 43 Ill. App. 312, 316. Negligence is a proximate cause of the injury, if it appears that but for such negligence the injury would not have happened, even though not the nearest cause in the order of time. Am. Ex. Co. v. Risley, 179 Ill. 295, 299; N. C. St. R. R. Co. v. Dudgeon, 184 *id.* 477, 488. The cause that placed the servant in the position where he was injured by another cause is a proximate or concurrent cause of the injury. Swift & Co. v. Rutkowski, 82 Ill. App. 108, 113. And where two causes combine to produce an injury, and neither is sufficient in itself, both causes will be regarded as proximate or concurrent causes. C. & A. R. R. Co. v. Wise, 206 Ill. 453; C. & A. R. R. Co. v. Averill, 224 *id.* 516, 520. In 1st Cooley on Torts (3d Ed.), pages 226, 227, the rule is stated to be:

''When the contributory action of all accomplishes a

particular result, it is unimportant to the party injured that one contributed much to the injury, and another little, the one least guilty is liable for all, because he aided in accomplishing all''.

In our opinion, therefore, if it be assumed that the engineer of the road engine was negligent, that fact would not relieve appellant from liability for the collision, because, under the law and the evidence, the jury might find that the negligent act of the switch-tender remained the concurrent cause of appellee's injury.

Upon a consideration of all the evidence bearing upon the question of liability of appellant for the injuries sustained by appellee, the verdict of the jury, in our judgment, should not be set aside as contrary to the weight and preponderance of the evidence.

The court, we think, did not err in refusing to set aside the verdict and in entering a judgment thereon, for the reason the verdict shows that the jury did not consider the covenant of appellee not to sue the Michigan Central Railroad Company, as running in favor of appellant as the agent and servant of that company in employing and paying Moore, the switch-tender. It is well settled that a covenant not to sue one of two joint tort-feasors is not a bar to a suit against the other. City of Chicago v. Babcock, 143 Ill. 358; C. & A. Ry. Co. v. Averill, *supra;* W. C. Ry. Co. v. Piper, 165 *id.* 325, 328. We do not think appellant was an employe of the Michigan Central Railway Company for the purpose indicated within the true meaning and legal effect of the covenant not to sue.

At the request of appellee the court gave the following instruction:

''4. The court instructs the jury, that even if you believe from the evidence that the engineer, or fireman, of the switch-engine, or the conductor of the switching crew in question, were guilty of negligence which contributed towards, or helped to cause, the collision in question, still if you further believe from the evidence

that the plaintiff did not in any way induce, cause or contribute to such negligence, if any, upon the part of the said engineer, fireman or conductor, then such negligence, if any, upon the part of said engineer, fireman or conductor, cannot be charged against, or imputed, to the plaintiff in this suit, provided the plaintiff was himself, before and at the time of the collision in question, exercising ordinary care for his own safety.''

It is urged that the court erred in giving the instruction because it directs the jury to return a verdict for appellee, even though they found that the accident was proximately caused by the negligence of appellee's fellow-servants on the switch engine; and because, it in effect contradicted instruction No. 2 by which the jury were told that appellee could not recover in this case for any negligent act of any employe of the Michigan Central Railway Company.

We perceive no conflict in the instructions. We think it states a proposition of law well settled in this state by the authorities cited *supra*.

At appellee's request the court gave the following instruction:

''6. The court instructs the jury, that if you believe from the preponderance of the evidence that the switch-tender in question was the servant of the Illinois Central Railroad Company, and was not under the direction or control of the Michigan Central Railroad Company, and that plaintiff was the servant of the Michigan Central Railroad Company, and was not under the direction and control of the Illinois Central Railroad Company, then the plaintiff and said switch-tender were not fellow-servants, within the legal meaning of that term.''

The criticism made upon this instruction is that it does not inform the jury as to the meaning of the term ''fellow-servants'', nor does any other instruction given in the case tell the jury the legal meaning of that term. And it is claimed there was evidence before the jury tending to show that the switch-tender was the servant of the Michigan Central Railroad Company,

and the jury were virtually told not to consider such evidence.

We are of opinion that there was no evidence tending to show that appellee was a fellow-servant with the switch-tender. We do not think that the jury were misled by the instruction; nor do we think the giving of the instruction was reversible error.

Finding no material error in the record, the judgment is affirmed.

*Affirmed.*